SYSTEMS, MR. KNIEDERLEKER. Thank you, Your Honor, and may it please the Court, this is the litigation side of this case that went forward concurrently with the interference, and at the heart of the case, as you already know from the interference, it's about two inventors that each invented an integrated control using different reticulocyte materials. Dr. Johnson invented an integrated control using maturation-arrested natural reticulocytes. Dr. Ryan, on the other hand, invented an integrated control using reticulocyte analogs and specifically what was called RNA-encapsulated red blood cells. Dr. Johnson went off and tried to patent his invention. Dr. Ryan, however, claimed not only his own invention, but also broadly claimed all integrated reticulocyte controls. So for purposes of this argument, you're not going to repeat all the discussion with respect to Dr. Ryan? Absolutely not, unless you have questions, but my point on this is that he broadly claimed all those, both analog and true, the latter of which he never invented, nor did he enable anyone else of ordinary skill in the art to make a use, and that's what I want to focus on today. Enablement's ultimately a question of law, but clearly turns on underlying facts, so what underlying facts do you believe should have gone to the jury with respect to the issue of enablement? With enablement? Your Honor, there's many underlying facts that demonstrate that this patent wasn't enabled. Give me the underlying facts that you think would have had to go to the jury for resolution. Certainly. The patents themselves. The patents in suit do not disclose how to make and use the integrated reticulocyte controls using true reticulocytes. Streck conceded that, they didn't disclose that. Dr. Ryan admitted he provided no working examples. Streck's expert, Dr. Janik, even said reticulocytes can be used, that the patents show that they can be used, but do not disclose how to make and use the integrated controls with true reticulocytes. That's your answer. His testimony right there says it. The patents do not disclose how to make and use it. Wait, say that again. This is at A45879. He was asked whether true reticulocytes, whether the patents disclose that true reticulocytes can be used, but do not disclose how to make and use integrated controls with true reticulocytes. Are you telling us that this evidence was withheld from the jury? The jury heard it, but the judge ruled on JAMAL and did not send this issue to the jury. So the judge took this away at the end of the evidence, Your Honor. All evidence was put in on this matter at trial, and the judge granted judgment as a matter of law and did not send this issue to the jury. Yes, and so now where was the error in the judge's conclusion that this question of law should be decided by the court? The error is that the evidence, including the patents themselves, and further evidence in the Wands Factors, and I can go through and recite a lot of evidence to you, Your Honor, the JAMAL standard, if you take that evidence in the light most favorable to the defendants, that the court could not conclude as a matter of law, taking all of those factual, all that factual evidence in the light most favorable to defendants, that this patent was enabled. Because you must show as a matter of claim construction that the claims, you aren't saying that the entire patent is invalid or that it was a matter of construing the claims to cover both forms. The claims were construed previously in the case to cover both forms, and in fact the accused products, two of them were natural reticulocyte accused products. And don't those both forms have the same physical properties? I mean don't they mimic each other? Not at all. They both mimic a human reticulocyte. That's the purpose of any control is to mimic whatever it is, whether I put in gummy bears and they come out looking like reticulocytes. That's a reticulocyte. Right, but were true reticulocytes clearly known in the prior art? True reticulocytes, obviously human reticulocytes are known in the prior art. So were animal reticulocytes. People have a very small amount of human reticulocytes. The fact that that's known, and even the fact that that might have been used in a stand-alone control, in no way suggests that one could simply integrate that in a control that would into an integrated control. Remember the burden here is on you, by clear and convincing evidence. So tell me what evidence you put in to show that one in the art would not have understood this. Dr. Simpson specifically said he had never done anything with integrated controls on cross-examination, right? Dr. Simpson has been involved with integrated controls. He has not personally developed one, I believe. The additional evidence is this. Dr. Ryan, who is arguably one of extraordinary skill in the art, explained that the development of an integrated reticulocyte control comprised of true reticulocytes is not a simple task. Dr. Langley, their expert, admitted that true reticulocyte, that the fact, and here's to your question earlier, the fact that a true reticulocyte works for its intended purpose in a stand-alone control does not mean that it will work in an integrated reticulocyte control. He testified that there would be a number of complications to overcome in order to use a reticulocyte-only control in an integrated reticulocyte control, and that would require quote, substantial testing to overcome those difficulties. That's at 846.013. Dr. Ryan admitted that substantial experimentation would be required, even with his disclosure, to create an integrated control with true reticulocytes. Mr. Scholl, co-inventor on two of the three patents. There's always experimentation that's going to be necessary to determine whether or not that the controls are sufficiently stable, because you have to run them over and over and over to make sure that they work, right? You do have to learn stability of the control, yes. I mean, don't we have to consider that the extent of experimentation in the context of what we're doing? If something needs to be run multiple times before you can ever determine if it's accurate, then by definition, that's normal experimentation, not extensive experimentation, isn't it? If you could do one test and say, wow, Dr. Johnson's patents explain how I should do this, I'll put in natural reticulocytes, and I expect I'll be able to run it and it'll work, yes. But if I have to run it over and over again and iterate... But you don't know if a control's working by running it once, right? Right, but you would run your series of tests to get the stability, as both the parties have addressed and suggested is true. So yes, you wouldn't find out in a day in either way, but you could find out in a month or two months. But Mr. Scholl, in fact, didn't say you could just run one test or a month of tests or two months of tests. Mr. Scholl said it would take the same testing that they did for their to develop an analog control like that, a team of three to four people, one to two years. And Dr. Ryan and Strack conceded that the development of controls is unpredictable. This is not a situation where you could say, I have a red blood cell that I chemically treated, that I injected RNA into, that I changed the pH, I changed the osmolarity, I put it in here. And one cannot simply say, well, I can take any other analog from an animal where I don't know the starting volumes, I don't know the concentration. In fact, Dr. Ryan said, I don't even know if there will be any in there. And simply say, well, you can use it by one scant offhand reference. This is, in fact, a case where Dr. Ryan believed you may be able to use natural reticulocytes as opposed to analogs. But the only thing he gave in his patents was a starting point. And he did not either describe that he had the invention, nor did he teach one how to make and use it. I have much more evidence I can provide. But did you present any evidence that, did you present someone with skill in the art, putting aside the things that you say Dr. Ryan said, because I've looked at all those citations in the record, and some of them seem to say sort of what you say they do, and many of them don't. So, putting that aside, what affirmative evidence did you put on by one of skill in the art to show that they wouldn't have understood how to use a true reticulocyte in this context? We put on our expert, Dr. Simpson, who testified to that. Dr. Simpson is an expert, he is a preeminent expert in this area. What did he say specifically? Because there are not many citations to his testimony in the record. Dr. Simpson agreed with Dr. Ryan's, let's see if I have his testimony marked, I know it is in the, it's in our brief, Your Honor, I don't have the recite with me in my outline. But Your Honor, it's not that Dr. Ryan, Dr. Scholl, Mr. Scholl, Dr. Langley, that their testimony isn't evidence. I guess I'm not understanding that. Their admissions are certainly evidence. I'm not saying their testimony isn't evidence. I'm trying to piece each part to find out what went in. I mean, Dr. Simpson's testimony was very conclusory, and then he conceded that he didn't have a lot of experience in this area. So, really, you're relying on those cross-examination statements from Langley and Ryan. We are primarily relying on that because this is a case where their own inventors admitted that this would take undue experimentation, that it would take the same amount of testing that they did to come up with their own control. If this was so easy, their own stand-alone control was out there before, too. It doesn't have to be easy in order to be within the claim scope. I mean, this is really the problem, isn't it, as to, with the district court receiving all of the evidence, and with your argument that it's not easy, and with their argument that we agree it's not easy, but it's within the concept, to understand where the errors, the reversible errors, are. But Judge Rayner, I think, had a question. Judge O'Malley hit right on the question that I had, and that's the type of evidence that you inserted into the record, and I've heard about the testimony, but aside from that, was there any other evidence that would indicate that true reciclates cannot be used in the same way as analogs? Well, the other evidence, aside from our own experts' testimony, would be evidence to demonstrate the differences with Johnson's application. If you examine Johnson's application, which was in the record, showing how he disclosed and used a natural reticulocyte, what you'll see is a great variation in the manner of use of his reticulocyte, and the methods in which it would be made, the mediums that were used, the buffers that were used. He did it differently. But that's not saying that they cannot be used the same way as you would use analogs. No one's denying that they can't be used, that true reticulocytes can't be used in integrated control. In fact, Dr. Johnson did just that. But the point is, Dr. Ryan, the inventor, first of all admitted he didn't invent it, admitted he considered whether this should be a part of his invention and dismissed it. No, he ultimately said it wasn't the preferred methodology because it's more difficult. He said the testimony specifically was whether or not he considered to be a part of his invention. But when Dr. Johnson provoked the interference, he told the patent office just to put these together, that this was the same invention. And now you're telling us that they're sufficiently different to his victim. They're overlapping inventions, Your Honor, because the claims that were claimed in Dr. Ryan's patents cover all of it, cover both types. And the case law is clear. If you decide you want to cover that broadly, you have to enable the full scope and to suggest and compare in the patent itself how you have detailed disclosures of all of the types of elements, of how to make them, although they're all out there in the prior art. Dr. Ryan goes to lengths to describe those elements. The one element he doesn't describe at all is how to use a natural reticulocyte in an integrated control. He doesn't describe it for the purposes of showing that he had possession of the invention. And he certainly, as their own expert admits, did not teach someone how to make and use that. Do you want to save your rebuttal time? Yes, thank you, Your Honor. Okay, we'll do that. Mr. Nishin. May it please the Court. R&D asserts that the teachings in the patent do not enable or apply to using true reticulocytes, but they provided no evidence of that fact, much less clear convincing evidence. In their reply, page 15, R&D argues that there was no evidence that one of ordinary skill in the art would be unable to use true reticulocytes in an integrated control by following the teachings of the patents relating to reticulocyte analogs. That's their argument. The problem with it is they got it backwards. We don't have to prove validity. It's true, though, that this isn't the best worded patent in the world. I mean, Dr. Johnson's application shows how it could have been written in a much better form, doesn't it? Not necessarily. There is one sentence that is, I think, is either dropped a phrase or something, but that's all. That's all. It's clear that he intended for reticulocytes, natural reticulocytes, to be covered. In his other patent that's incorporated by reference, he points out that his encapsulated red cell is so good that it has the same morphology as a real reticulocyte. But that wasn't for an integrated control, correct? It's for a cell. Right. We're starting out with, he wants to start out with a cell, and he can give this cell the same characteristics as a natural true reticulocyte. All right, so that's an analog. That would get into drafting problems, but this court has decided that if it's not a true reticulocyte, it wasn't born as a reticulocyte, it's an analog. Whether that's the right construction, whether it is the right construction for this case, that's the way the patent was written. You may be right that it wasn't written perfectly, but that's what we got. And it's clear, Your Honor, that Dr. Ryan pointed out how his analog was not, it didn't just mimic, he made it almost be a reticulocyte. He gave it the same, he used a red cell, same membrane. He said the morphology is the same, which is one of the characteristics that these instruments measure in order to determine whether it's a reticulocyte or not. He said that it will absorb stains, the same stains that are used in existing machines to differentiate reticulocytes. So he's got a, you want to call it a synthetic reticulocyte that is basically like a natural reticulocyte. That was all pointed out. How do you deal with the testimony that's clearly in the record that there would need to be substantial testing before you could use a true reticulocyte in this context? You're right in the sense that, Your Honor, there was some testimony from some of the witnesses about some testing, but that wasn't the question. The question that was asked was would it take undue testing or would it take, what would it take in 1999 before Dr. Ryan's invention? That's the answer as they quote back to you as to what they thought it would be before Dr. Ryan's invention. Well, that's not relevant to enablement. You learn from the specification and say, Ken, is it enabled in light of the prior art and what Dr. Ryan contributed? Their evidence, they keep floating out these bits and pieces of testimony, most of which were asked, what was it like before Dr. Ryan? Or, well, did you think it was obvious or easy to do before Dr. Ryan? Well, of course not. It would have taken a lot of testing. That's what Dr. Ryan did. Is there evidence in the record that Dr. Ryan ever used a true reticulocyte in this context? No, not in integrated control, and that's not required. It's not required. The fact that he reduced it to practice... I understand that, but it would help, right? If there was evidence of that. It would help, but I don't have it. So, no, he didn't, but that doesn't mean he couldn't have followed the teachings or anyone else couldn't have followed the teachings. That's not evidence of that. That's just evidence that Dr. Ryan made decisions, commercial, practical, or because he liked them, that's what he chose to reduce to practice. That is not evidence that someone could not follow his teachings and use a true reticulocyte in an integrated control. How do you respond to the argument that Dr. Langley essentially testified that this would be extremely difficult? Dr. Langley is one of those people I believe that is... That's one of those bits and pieces that were floated out there, Your Honor. Dr. Langley, and the question I've got here... I don't understand what you mean. That's one of those bits and pieces that were floated out there? Bits and pieces of testimony that they throw out, not knowing what the question is. They take it out of context. The question he was asked at that time was, quote, with regard to the state of the art, as you understood it as one of ordinary skill in the art in 1999, were there a number of That's not relevant to what we're talking here. So his response was, he talked about, oh, standalones have this problem, they may have different solutions, and also he was asked to take an existing standalone product with the cells that have already been treated for that product and use it over here. That's... Dr. Ryan's never suggested that. He says you use true reticulocytes and you treat it to be used in the way that he taught in his disclosure. The court was correct, it really is a matter of law, that no reasonable jury could have found otherwise, that there was no enablement that Dr. Ryan didn't teach how to use if you read his disclosure. Wouldn't it have been cleaner if the trial judge just sent some of these underlying facts to the jury and then we'd be in a whole different posture of review? Yes, it would have, but he didn't. You asked him for a JMAW and maybe you shouldn't have asked for it? It wouldn't be my first mistake, Your Honor, but I'll admit that. But he did grant it and he gave sufficient reasons. The evidence, it was there, it is in the record, it's fully supported by the record. Their testimony, look at their expert, they're trying to blame all this on distract witnesses, but in fact their expert came forward with very little or no testimony, only conclusory statements. When they ask him, well, what are the factors, what factors did you look at? His testimony lasted all of three pages. Description, his response, well, the first one would be the amount of description that I mentioned. There is no real description in the patent itself enabling one to do it. The second thing he looked at, no examples. Dr. Ryan never said he had at that time made a control, an integrated control, so there were no examples. That's fine, but it's not required. He also said that there would be, quote, fair amount of experimentation. Not undue experimentation, even a new, even an old control that's being modified in any way has to be tested. It has to do the stability testing. They make the point that Dr. Ryan said, well, it might take more than two months. Stability testing by itself takes more than two months for a standard control. So their evidence, it does not support undue experimentation, undue testing. Nothing but routine testing. Running a sample through these machines to determine whether there's interference or whether there is other problems is routine. And that takes a year or two years? Three or four people? No. If you're designing from a new control, that was the question, a new control. You've got his, he also testified it wouldn't take anybody that long if they saw what I did. Again, out of context, what was the question when he gave these opinions? Now, we go back to the other evidence they're relying on. As I say, their expert gave very little or no opinions other than conclusory opinions. But where does Dr. Ryan explain how he would use the true reticulocyte in his integrated control? Does he explain that anywhere? He says right up front that the reticulocyte component can be either one. Then he goes in great detail as to how to do one. He doesn't indicate that you can't just take that natural reticulocyte or true reticulocyte and process it the same way. But there's plenty of testimony that they're not as stable as the analogs, correct? Not as stable. That testimony has to do with natural, untreated reticulocytes. He had testimony, and again, they get this somewhat confused. He never said a natural reticulocyte was a problem. You just can't get enough of them. The problem he described had to do with trying to create natural reticulocytes or more of them from an animal. You have to inject chemicals. You have to treat the animal. This has caused all kinds of problems with the reticulocytes itself because you're trying to increase it. Those characteristics do change, and that's one of the reasons he said we've got to find a better way because his business needed a larger supply. Not that he couldn't use them. Not that he ever said they wouldn't work, and not that he ever said that this wouldn't work if you followed the teachings in my pattern. He said we just can't get enough of them. That's why we don't go that way. That's why he, quote, dismissed further testing of natural reticulocytes. He knew he couldn't use them. He knew there was no practical way to use them, so why go down that road, as he said. So they only offer attorney argument, Your Honor, to support their positions. But the real inquiry is what else did they show? Brief testimony there. They did not. They never tied in any of the general concepts that's generally looked at. Unpredictability, complexity, and experimentation to the state of the art after Dr. Ryan's invention. They never took that into consideration. They never get to that point. They talk about the experimentation, unpredictability, without the benefit of Dr. Ryan's disclosure. Now, Your Honor, we don't believe there's any question that a reasonable jury could find any other way, given this record. And therefore, the judge was justified in entering a JMOL. His opinion was not very detailed on this issue, was it? We've got the oral statement, and then we simply have, I mean, I think he promised to write, I think he referred an erudite opinion, but he later just does it in one or two sentences, right? And repeats what he said in court? Well, Your Honor, his decision was right. His judgment was right. Whether his opinion could have been better, there are a lot of opinions I think could have been written better, but I can't control that. We won't ask you to tell us whose. Let me ask you something before you end about the injunction. As I understand it, you concede that there, or at least, I guess I shouldn't say concede, you at least agree that there would be no problem with this court narrowing the scope of the injunction. No. And it wouldn't change the impact of what you believe you're entitled to. It's clear, Your Honor, that injunction, the way it's worded now, it's clear what they can do and what they can't do. They only object to the last sentence down there. We think it was proper under one of the cases. If this court believes it's not, then it can delete that and we have no problem with that. The injunction, what we do want is the injunction to stay in effect, regardless of remand or not. It's clear, I mean, for some other reason, but they're here talking about unasserted claims and things like that, trying to avoid the injunction. We think the injunction's fine. It's in place now, and they only object to a technical problem in the wording. That's fine. The court can... Let me ask you about... I don't want to go over. Let me ask you about the unasserted claims issue. When you set out your contentions, your infringement contentions, and you set out under the local rules the claims that you were relying upon. Yes. Is it your view that those local rules effectively operate to amend your earlier complaint? That was the rules that we agreed to go under, Your Honor, that we could... By certain dates, we would designate claims. So, as far as amending the complaint, we put them on notice with that designation. We exchanged the information timely, so I think we did comply with the... I think it was the Northern District of California rules that we agreed to go by. And the district court's order actually has the wrong date, doesn't it? I mean, it says 2008, but that's not right. We've gone back to the docket, and it was 2006, wasn't it? When I filed the case, yes, Your Honor. Well, 2006 when you put in your contentions as to the claims. You mean the original complaint? No. I'm talking about right after the court put the system in place under the local rules. The court cites 2008 as the date, but if you go back and look at the docket, that isn't correct, isn't it? I did not check that, Your Honor. Because there's no doubt that it was early 2007 when R&D filed their response to your contentions. I think that's right, but I don't know. I didn't check the date. Okay. Okay. Any more questions? Any more questions? Okay. Thank you, Mr. Nation. Mr. Niederle. Your Honor, on the question of the amended complaint, no, I don't believe it would affect the complaint itself or amend the complaint. I'd like to touch quickly on the question of JMAL. I really, with all due respect, don't think there's a question of whether or not the court erred in granting JMAL or summary judgment on the written description enablement. I would ask, as Mr. Nation raised, that in light of the discussion, the court's further view of this, that in fact that stay be removed pending the ultimate decision if this does get remanded down to the district court or if the court rules as a matter of law, which we think it should, that the patent wasn't enabled or had written description. We would ask that the court remove now, stay the injunction so that we don't continue to be irreparably harmed by being under this injunction and forbidden from being in this market. Your Honor, I would note in terms of evidence and the question of whether or not the patent was disclosed enough information, Dr. Janik himself with regard to the more detailed Johnson application said that unless the spec provides direction as to specific true reticulocyte volumes and concentrations, a person of ordinary skill in the art is sent on a wild goose chase in search of reticulocytes from almost any potential fraction of blood settled. Certainly with Dr. Ryan's scant reference, you can't even start that search. The court looks at the Wands factors. Streck has admitted that six of the eight or hasn't contested six of those eight Wands factors and that they apply in favor of us. In each one of those, he just discussed a few of them and said, well, yeah, we don't dispute that there's no direction. We don't dispute this. We don't dispute that. But that one factor isn't dispositive. Well, but six of the eight certainly would prevent JAMAL. And in fact, we believe there's no evidence to prevent the judgment as a matter of law on either written description or enablement in defendant's favor. If the court has any questions, I see I'm over my time. Any more questions? No. Thank you. Thank you. Thank you, Mr. Maynard. Thank you, Mr. Misha. The case is taken under submission.